UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

Eastern District of Kentucky
F I L E D
SEP 1 6 2005
AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

**CRIMINAL CASE NO. 05-45-DLB**

**UNITED STATES OF AMERICA**                                **Plaintiff**

v.

**PHILLIP WELDON**                                                      **Defendant**

### REPORT AND RECOMMENDATION

Defendant Phillip Weldon is charged in two counts of a three-count federal indictment, along with two co-defendants, with conspiracy to distribute cocaine and possession with intent to distribute cocaine. Defendant Weldon filed a motion to suppress "all evidence derived from the illegal, unreasonable warrantless search, seizure, and investigation in this case." (Doc. 37.) The United States filed a response, (Doc. 40), and an evidentiary hearing was conducted on September 15, 2005. Mr. Weldon was represented by Firooz T. Namei and the United States by Anthony J. Bracke. The proceedings were transcribed by Melissa Fuller, of Spangler Reporting Services, Inc. Neither party requested a transcript of the hearing or an opportunity for further briefing. Therefore, the motion to suppress is ripe for decision and has been referred to the undersigned for report and recommendation. *See* 28 U.S.C. § 636(b).

### Factual Background

Brett Benton, a Kenton County Police Office, testified that he was assigned to the Canine Unit and had been certified since 2002. His initial training was four weeks, and he has had continuous training since that time, including six hours each week. All of that training had been with the one dog he has worked with as a member of the unit, Tommy. Tommy is also certified, for

1

cocaine, heroin, and methamphetamine. Benton and Tommy have conducted "several hundred" investigations. Tommy's rate of false positive is less than two percent; in Benton's opinion, the dog makes "few mistakes." Tommy's signal for a positive alert is to lie down.

On the evening of February 3, 2005, before he reported for work on the 7 p.m. to 5 a.m. shift, Benton received a telephone call from Andy Muse, an officer assigned to the drug task force, who reported that he had received information from the Extended Stay Hotel in Covington, Kentucky, that two people who had arrived in separate vehicles, arrived at different times, and were staying in different rooms, gave the same street address in Texas. Benton took down the information, noting that an individual named Darryl Gant was staying in Room 108, and one named Tamera Simmons was staying in Room 410. Benton had Simmons' date of birth as well, but no other information on either individual. When Benton arrived at work, he told his supervisor that he and his partner, Officer Caldwell, would follow up on that information.

Around 11:00 p.m., Benton and his partner took Tommy to the Hotel and had him sniff every room on the first floor of the west wing of the Hotel by walking the common hallway and allowing him to approach the exterior of each door. Tommy laid down in front of the door to Room 108, but did not give a positive alert to any other room on that floor. They followed the same procedure on the fourth floor, where Tommy gave a positive alert to Room 410, but no other room. Benton then took Tommy back to his vehicle, and he and Caldwell went to Room 108. They knocked and the door was answered by a male; the officers asked for consent to search the room, which was given by the individual who identified himself, and provided a Texas driver's license in the name of, Darryl Gant. The man was cooperative, and the officers did not place him in handcuffs, restrain him in any way, or tell him that he could not leave. The officers seized nothing from the room, but

2

observed a large amount of case in the man's luggage and three cell phones on a night stand. No drugs were found in the room. They thanked the man and left the room.

Next, Benton and Caldwell went to Room 410, which was where the cocaine was found that is the subject of the prosecution.[1] The occupant of that room, Tamera Simmons, told the officers that she had arrived with an individual named Phil Weldon, who brought the cocaine and left it on her nightstand. She put it in her bag. She described Weldon as a black male with dreadlocks who was using a false name. She recalled that the first name was "Darryl," but did not recall the last name until Benton asked her whether it was "Gant." She replied that it was. She told officers that her cell phone battery was dying, so she had given her phone to Phil Weldon to charge for her. Weldon, she said, had left to get another woman, Terrie, at the bus station at 3:00 a.m., but at that time, Simmons did not tell the officers why Terrie was coming to Northern Kentucky.

Benton sent Caldwell downstairs at that point to watch Room 108 until other officers could arrive. However, the security guard told him that the occupant of Room 108 had left the Hotel by a side door. Caldwell conveyed that information to Benton, who called other officers who were enroute and told them to look for the individual. Covington police were also notified, and two Covington police officers found him at the Holiday Inn, which is also on Third Street. Those officers returned the man, in handcuffs in the back of their cruiser, to the Extended Stay Hotel. Benton asked the individual his name and was again given the name of "Darryl Gant." He informed the man that it was a criminal offense in Kentucky to provide false identification and was then given

---

[1] On cross examination, Benton testified that he estimated the quantity to be about 8-10 ounces in two separate round or oval shaped packages, wrapped in duct tape. He field tested both, taking a sample from each package by cutting a small slit with a knife and placing the material in two separate field test kits. Both tested positive.

3

the correct information. Having learned the correct name, Phillip Weldon, Benton checked for warrants and learned that Weldon had an outstanding warrant in Texas. Weldon was then arrested. From his person, Benton took two cell phones and over $900 in United States currency. No drugs were found on Weldon's person. Benton did not obtain a warrant to use the cell phones.

The arrest took place at approximately 12:50 a.m., and Weldon was removed from the property at approximately 1:00 a.m. As Weldon was being removed, the Hotel's security guard came out, asked for his room key, and informed Weldon that he could not return to that room. Officers later asked the guard to let them in to Room 108, which she did. When they entered the room, they found a third cell phone, which was red and had been described to officers by Simmons as being hers, and which she identified as hers afterwards. They also took a Greyhound bus ticket in the name of Darryl Gant.

Simmons informed the officers that Terrie Rogers was arriving from West Virginia to pick up the drugs, that she would be carrying large amounts of currency, and that she would be taking the drugs back to West Virginia. At approximately 3:30 a.m., one of the cell phones seized from Weldon rang. Simmons was instructed to answer, which she did. She gave Rogers directions to the Hotel. When Rogers arrived, police arrested her and took from her a note on Weldon's letterhead, a receipt from the Drug Enforcement Agency in Chicago for bundles of money, and a bus ticket.

The only other testimony at the hearing was from the security guard at the Hotel, Betty Davidson, who testified that she was the only employee at the Hotel after 11:00 p.m. Her duties are to make rounds, to keep an eye on things, and to use her master key to let in guests who have locked themselves out of their rooms. She was told by the desk clerk on the evening of February third to "keep an eye" on Rooms 108 and 410, because Andy would be coming sometime. The guard knew

4

nothing more. She watched the officers conduct the drug sniff with the dog and confirmed that he laid down in front of Room 108, but nowhere else. She did not know what happened on the fourth floor, because she did not follow the officers there. She saw a black man leave Room 108 and exit via a side door that faces the bridge; she saw him head toward the Holiday Inn, but she did not follow him. She also saw the Covington police return the same man, in handcuffs. She called her manager on duty about the arrest and was instructed to get back the key, not allow the arrested person back in the room, and change the key to that room. She did. After Weldon was taken away, Benton and Muse asked her to let them in to Room 108, which she did, but she did not accompany them. On cross examination, she indicated that cabs do not usually wait outside the Hotel, but that she can sometimes see them in front of the Holiday Inn at certain times of day.

As no issues of credibility require resolution, the Court should find the facts to be as stated above.

## Analysis

Defense counsel conceded that Defendant Weldon lacked standing to challenge the search of Room 410. His arguments centered on the initiation of the investigation, the decision to knock on and ask for permission to search Weldon's room, and the arrest of Weldon without a warrant.[2] No argument was made, either in the motion and memorandum or at the hearing, that Weldon's consent to the initial search of Room 108 was not voluntary.

"A positive indication by a properly-trained dog is sufficient to establish probable cause for

---

[2] Although the original motion also refers to statements that must be suppressed because they were obtained in violation of Weldon's Fifth and Sixth Amendment rights, that argument appeared to have been abandoned. In the memorandum supporting the motion, no statements were identified, and during argument and questioning at the hearing, no mention was made of any statements.

the presence of a controlled substance." *U.S. v. Robinson*, 390 F.3d 853, 874 (6th Cir. 2004)(quoting *U.S. v. Diaz*, 25 F.3d 392, 393-94(6th Cir. 1994)). Both the training and the reliability of the dog must be established, however, and the training of the handler must as well. *Id.* In light of the undisputed facts that both the dog and the handler were properly trained and certified, and that the dog positively alerted to Room 108, the officers had probable cause under the authority of *Robinson*. Clearly, had Defendant Weldon declined the request for consent to search, the officers could have obtained a warrant based on the strength of the dog's positive alert to the room. That they chose to knock on the door and to attempt to gain the voluntary cooperation of the individual inside certainly worked no violation of any of that individual's constitutional rights.[3] Such consensual encounters are permitted even when an officer totally lacks "any reasonable suspicion of criminal activity so long as the officers refrain from . . . intimidating behavior." *See U.S. v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997).

Nor was Weldon's detention at and return from the Holiday Inn an impermissible search and seizure. By that point in time, officers knew of the connections between Simmons and Weldon, had been told that the cocaine belonged to Weldon, had seen Simmons' cell phone in Weldon's room, and believed that Weldon had given them false identification. Surely this information would provide the requisite "reasonable and articulable suspicion" required for a *Terry* stop. *See U.S. v. Hurst*, 228 F.3d 751, 756-57 (6th Cir. 2000).

Finally, Defendant Weldon was arrested when Benton learned of the outstanding Texas

---

[3]Nor was any evidence presented of an improper purpose for the dog's presence at the Hotel. The Hotel called police, and they responded by bringing a dog into a common hallway. Despite defense counsel's allegations of bias on the part of hotel employees, the reason for their call to a task force officer is irrelevant to the issue before the court. The undisputed facts are that the call was made, and the officers were dispatched to investigate.

warrant. He was not, therefore, arrested without a warrant, as was stated in the motion and memorandum.

Therefore, the Court should hold that at no stage of contact with Defendant Weldon, from the initial consensual encounter through his arrest, did the officers involved in the encounters and arrest violate any of his constitutional rights.

### Conclusion

Particularized objections to this Report and Recommendation, clearly identifying those issues on which further review is desired, must be filed within ten days of the date of its service or further appeal is waived. *U.S. v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985)(upholding the Sixth Circuit's creation of the waiver rule at issue in *Walters*). Similarly, a party may file a response to another party's objections within ten days after being served with a copy of those objections. Fed. R. Civ. P. 72(b).

Dated the ___16___ day of September, 2005.

J. GREGORY WEHRMAN
UNITED STATES MAGISTRATE JUDGE