**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON**

**CRIMINAL ACTION NO. 05-45-DLB**

**UNITED STATES OF AMERICA**                                              **PLAINTIFF**


**VS.**                              **MEMORANDUM OPINION AND ORDER**


**PHILLIP WELDON**                                                        **DEFENDANT**

*******************************

## I.     Introduction

This matter is before the Court upon Defendant Weldon's Motion to Withdraw Guilty

Plea.  (Doc. # 174).  The government having filed its response in opposition to the motion

(Doc. # 175), and the Court having conducted an evidentiary hearing on the motion on

July 10, 2006, the motion to withdraw guilty plea is now ripe for the Court's review.

For the reasons that follow, the motion is **denied**.

## II.     Findings of Fact

Upon consideration of the testimony elicited during the July 10, 2006 hearing,

May 22, 2006 pretrial conference, and the extensive prior record of the proceedings in this

matter, including the lengthy plea colloquy conducted, the Court makes the following

relevant factual findings with regard to Defendant's motion to withdraw guilty plea.

1. During his pretrial preparations, Weldon's former defense counsel Firooz Namei[1]

contacted Peter Alderucci to examine a latent fingerprint to determine if, in Alderucci's

---

[1]  On June 28, 2006, Mr. Namei was permitted to withdraw as counsel and F. Dennis
Alerding was appointed as new counsel for Weldon.  (Doc. # 180).

1

opinion, there were sufficient points to make a positive identification.  The print was on a piece of duct tape which surrounded the cocaine involved in this case.  Alderucci's qualifications were stipulated to by the government.  (Doc. # 185, TR of 7/10/06 Hearing at 2-3)

2.   Because the duct tape was in the custody of the Kenton County Police Department (KCPD), Mr. Alderucci contacted KCPD Detective Tim Scheidt so he could examine the duct tape and print.

3.   On May 15, 2006, Alderucci met with Scheidt at the KCPD and examined the duct tape and print.  This examination occurred in the presence of Scheidt.  After examining the print, Alderucci told Scheidt he thought he could see 6 or 7 points and thought there were enough points to make an identification.  Alderucci also asked to see the original Kentucky State Police lab results.

4.   After leaving the KCPD, Alderucci contacted Mr. Namei, informed him that he thought there was enough to make a comparison, and asked if he wanted him to compare the latent print to a known print of Mr. Weldon.  Mr. Namei instructed Alderucci to do the comparison.  Alderucci thereafter contacted Scheidt to obtain a known print, referred to as a 10 point card, from Mr. Weldon so a comparison could be made.

5.   On May 16, 2006, Scheidt furnished Alderucci with a 10 point card from Mr. Weldon for comparison purposes.  This comparison was conducted by Mr. Alderucci in Scheidt's presence at the federal courthouse in Cincinnati where he worked as a Court Security Officer.  Scheidt observed Alderucci conducting the comparison with a magnifying glass.  This observation included Alderucci counting points from the known 10 point card and comparing that to the latent print on the duct tape.

2

6.  After conducting his comparison, Alderucci told Scheidt that he thought the print matched that of Mr. Weldon.[2]  The Court made this same finding on May 22, 2006 (Doc. # 182: TR 5/22/06 Hearing at p. 9) and the contrary testimony of Alderucci does not change the Court's factual determination.[3]

7.  Upon receiving the information regarding a possible match of fingerprints from Alderucci, Scheidt informed AUSA Bracke of that information.   Bracke immediately thereafter had the latent print resubmitted to another expert, Ms. Angie Keller of the Covington, Kentucky Crime Lab.

8.  On May 17, 2006, AUSA Bracke sent an e-mail to Mr. Namei and Lisa Bushelman, counsel for co-defendant Rogers, indicating that he was informed that both Weldon's expert and Ms. Keller had made an 8 point match on the fingerprint on the duct tape wrapping as matching Mr. Weldon's known print.  (Doc. # 155 -3).  The following day Bracke faxed a letter to Namei and Bushelman notifying them of Keller's findings and her expert report.

9.  On May 18, 2006, Mr. Namei visited Weldon at the jail and showed him the e-

---

[2]  Although Alderruci testified that he never directly made any such statement, in resolving this discrepancy, the Court credits the testimony of Detective Scheidt.  In making this credibility determination, the Court believes Alderucci's statement that the request for Weldon's 10 point card was "several days later" (Doc. # 185: TR 7/10/06 Hearing at p. 9) when it was in fact the very next day, is crucial in resolving the discrepancy.  Detective Scheidt's version is also supported by the fact that AUSA Bracke had the latent print resubmitted in the first place.  But for the statement by Alderucci of a possible match, and in view of the prior report by KSP Examiner Howard Jones, Bracke would have had no reason to resubmit the print for further analysis.

[3]  Alderucci acknowledged that Scheidt observed him conducting his comparison and counting points.  According to Alderucci, he told Scheidt that he was "satisfied that I've seen everything I need to see."  (Doc. # 185: TR 7/10/06 Hearing at p. 6) However, Alderucci acknowledged that it would have been "pretty obvious" that "I was counting points that was coming up with some kind of a match."  (*Id*. at 11)

mail from AUSA Bracke which informed Weldon of the positive fingerprint match.  This was 4 days prior to trial.  Up to that point Weldon was under the belief that there would be no fingerprint evidence admitted at trial.  Weldon's belief was based upon the parties' written stipulation filed on April 18, 2006 wherein the parties agreed that KSP Examiner Howard Jones' report[4] could be admitted into evidence.  (Doc. # 133).  During this visit, Mr. Namei discussed with Weldon the impact that the fingerprint evidence would have on the possible outcome of the trial.

10.  Mr. Namei thereafter filed a motion in limine seeking to exclude any evidence of the positive fingerprint match by examiner Keller.  After a telephonic hearing on that motion on May 19, 2006, the Court denied the motion.  Mr. Namei thereafter filed a second motion to exclude reference to fingerprint identification.

11.  At approximately 9:00 a.m. on May 22, 2006, and prior to calling the jury in for the start of voir dire, the Court conducted a final pretrial hearing during which Detective Scheidt testified regarding his version of events surrounding Mr. Alderucci's comparison of fingerprints.  After hearing evidence and argument from counsel, Weldon's second motion to exclude the fingerprint evidence was also denied.

12.  After the Court ruled that the fingerprint evidence was admissible, the defendants requested a recess so they could assess the impact of the admissibility of the fingerprint evidence and discuss the possible options with their attorneys.  After the recess, which lasted approximately 15 minutes, Miss Rogers entered her guilty plea.  Weldon met with Mr. Namei for the majority of the 30-40 minute plea colloquy Miss Rogers had with the

---

[4]  According to Jones' report, no latent prints of value for comparison purposes were developed.  *See* Defense Exhibit 1A, admitted during the July 10, 2006 hearing.

4

Court.  The Court continued to hold the petit jury pool in abeyance until each defendant had sufficient time to discuss their options with counsel.

13. At approximately 11:20 a.m., the Court reconvened, with Weldon indicating that he wished to enter a "no contest" plea.  The Court thereafter advised Weldon of the possible consequences of a no contest plea, which may include no reduction for acceptance of responsibility based on applicable case law, and a reduced likelihood, based on the Court's prior experience with other defendants, of a substantial assistance motion at sentencing.  The Court advised Weldon of these items so he could make an informed decision.  The Court also advised Weldon of the possibility of a conditional plea of guilty pursuant to Rule 11(a)(2) which would enable him to preserve certain constitutional issues which had been raised in pretrial motions.

14. Weldon thereafter asked for a little more time to talk with his attorney and AUSA Bracke stating:

> THE DEFENDANT:  ... I just wish I had just a little time just to talk to these two together just to, you know, make sure that everything is met before I actually give up my rights like that.  That's my only concern.  I just – because we had spoke briefly, but we really didn't – you know, it's stuff that I need to know for sure, you know, that it's going to take place with my guilty plea before I plead guilty.

(Doc. # 179: TR 5/22/06 at p. 8).  The Court responded to Weldon's request by giving him additional time to consult with the attorneys stating:

> THE COURT: I'm not going to force you to plead guilty, but I feel like we have 62 jurors waiting to start this trial....  If you want a little bit more time... I can give you perhaps till 12:00 noon.  That's only 25 minutes.

(*Id*.)  Weldon responded "that's fine" (*Id*.)  The Court further stated:

> THE COURT: But I don't want anyone who is reviewing my record to decide that, you know, Judge Bunning forced his hand.  I think what I need to have

you do is make a decision.  Are you going to go to trial, or are you not going
to go to trial.  If you don't go to trial, you have options...

(Id. at 8-9).

15.   Defendant thereafter asked the Court if it could sentence him below the
guidelines to which the Court responded that it could, indicating that was something the
Court would go over with Weldon if he advised that he was going to plead guilty.  The Court
thereafter took another recess until 12:00 noon and provided Weldon's defense attorney
with the 2005 Sentencing Guideline Manual so he could review the guidelines with Weldon.

16.   After the recess Weldon's attorney told the Court the parties had reached a plea
agreement and the Court asked Weldon if he had sufficient time to speak with his attorney
and AUSA Bracke about entering a plea, to which he responded "Yes, I had sufficient time
to talk about it."  (*Id*. at 11) The terms of the oral agreement were that Weldon would enter
a straight, as opposed to a conditional, guilty plea, the government would recommend a two
level reduction for acceptance of responsibility, the government would ask for the low end
of the guidelines as calculated, if Weldon provided substantial assistance, then the
government would make a U.S.S.G. § 5K1.1 motion on his behalf at sentencing, but the
recommended reduction would not exceed 50%, and the government would consider a
Rule 35 motion for an additional reduction post-sentencing.  (*Id*. at 12-13)

17.   After being sworn, Weldon advised that he was 33 years old, had completed
high school, and two years of college.  Although Weldon indicated that he would have liked
to have more time (*id*. at 16), he was steadfast in his statement that he had made a
decision to plead guilty.  Weldon also stated that while it was his "every intention to go to
trial" (*id*.), he decided to plead guilty because he did not want to go to trial alone (referring

6

to co-defendant Rogers' earlier guilty plea), thought his chances of winning were slim, and the penalties he would be facing if convicted at trial did not justify the risk of proceeding to trial.  (*Id*. at 16-17)

18.   During the plea colloquy the Court asked Weldon if he was pleading guilty because he was in fact guilty of the offenses charged to which he responded "Yes, I'm pleading guilty upon the offenses."  (*Id*. at 21)

19.   The Court then proceeded to advise Weldon of the consequences of entering a guilty plea, such as the statutory maximum penalties he was facing, the supervised release term, the requirement of considering the advisory sentencing guidelines and other factors in 18 U.S.C. § 3553(a).  The Court also advised Weldon that by entering a straight guilty plea he was waiving his right to appeal any adverse ruling on any pretrial motion to the Sixth Circuit Court of Appeals.

20.   The Court further inquired of whether Weldon had spoken with his attorney about the sentencing guidelines and he indicated that he had.  The Court then discussed the possibility that Weldon may be a career offender under the guidelines and the consequences of that designation, which included an advisory range of 210-262 months. Weldon stated he understood.  The Court also advised Weldon that whatever the recommended guidelines were by the U.S. Probation Office in the presentence report, either side could object to those calculations, and the ultimate sentencing guideline range determined by the Court would be advisory.

21.   The Court then advised Weldon of the constitutional rights he was waiving by entering a guilty plea, including his right to a jury trial, right to remain silent, and right to compulsory process.  Weldon stated he understood.

22.    When the time came for Weldon to indicate what he had done which made him believe he was guilty of the charges in the Indictment, while he disputed the involvement of co-defendant Terrie Rogers, Weldon candidly admitted that he had conspired with co-defendant Tamera Simmons to obtain the cocaine ultimately seized from Room 410 and for her to transport the cocaine to this area for purposes of sale by him.

23.    Although Weldon had maintained his innocence up to that point in the proceedings, once he decided to enter a guilty plea, he did not hesitate in admitting his guilt to both counts.  After determining that Weldon was aware of the nature of the charges and consequences of his guilty plea, and that there was a factual basis for the guilty plea, the Court accepted Weldon's guilty plea and scheduled sentencing for September 1, 2006.  At the conclusion of the plea colloquy, the Court asked Weldon if he had any questions about what had occurred and he indicated that he had no questions.

24.    In a *pro se* letter dated May 26, 2006, Weldon moved to withdraw his guilty plea.[5]  In his letter, Weldon stated that he entered his plea under duress, wanted his attorney to challenge the admissibility of the newly obtained fingerprint evidence, and was "sand-bagged" into pleading guilty due to Detective Scheidt's alleged false testimony about what Mr. Alderucci had told him about his fingerprint comparison.[6]  Defendant further alleged that he "was under the assumption that the Career Criminal enhancement was mandatory because no one told me it wasn't."  Due to what he perceived as misconduct and deception on behalf of Detective Scheidt, Weldon asked the Court for permission to

---

[5]  The letter was filed on June 2, 2006.

[6]  As found by the Court (*see* footnote 2 herein), the testimony of Mr. Alderucci on July 10, 2006 did not alter the Court's conclusion that Alderucci had told Scheidt about his findings.

withdraw his plea.

25.   Within that same letter Weldon makes several pleas for leniency by the Court at sentencing, stating:

> I realize that if there can not be a *remedy reached to resolve the issues I have with this plea*, there can be no doubt in my mind that if this case goes back to trial and I am found guilty, I'm taking the chance to receive the maximum penalty allowed.  I do not want that to happen, and *all I desire to do is pay my debt to society* for the last time, never to return back to the life of crime.  I know your Honor has heard this same claim from men in trouble many times before, *asking for leniency at sentencing*.

(Doc. # 67 at p. 4) (emphasis added).   Weldon continues:

> *I've confessed my sin to you in open court on May 22, 2006*, and I've confessed my sin to God and he has forgiven me.  I humbly ask that you dig deep within your heart to put aside any animosity or personal feelings you may have toward me, and use the discretion that GOD has given you, to *sentence me according to my crime*, whenever that day comes.

(*Id.* at p. 5) (emphasis added).   Weldon continues in his request for leniency:

> ... *I'm willing to take any sentence within the (57-71) month guideline range for this crime....   I'm making this request also because I am aware that you have the discretion to sentence me to anything you want*....   I'm asking that you consider this sincere surrender to authority on my part, as an alternative to eliminate this proceeding any further, and view this as a man who can do more good for society than harm.
>
> ***
>
> If I had been offered to plea out to the drugs that were found in Tamera Simmons' room, and be sentenced only for the drugs and not my record, I would've certainly taken a plea while this was in the state of Kentucky jurisdiction.  Like I explained to the Court on May 22, 2006, *I knew what my intentions were* and God knew that I had no plans or made no plans to distribute these drugs with either of my co-defendants.  There was no real conspiracy[7] or on going operation amongst me or my co-defendants, and

---

[7] Although Weldon argues that was never any conspiracy, he candidly admitted during his May 22, 2006 plea that co-defendant Simmons introduced him to a Jamaican male named Chris who assisted him in obtaining cocaine.  (Doc. # 179: TR 5/22/06 at p. 46).  Weldon also told the

there certainly was no prior agreements made between any of us.

(*Id*. at p. 6) (emphasis added).

26.   Weldon concludes his letter with the following:

[T]here is no way that I will be at peace with the plea I took on May 22, 2006 *if the agreement can not be better negotiated*...   Had I known that this detective lied and that the Career Criminal was not mandatory but up to the Government and the Court to impose, I would not have entered that particular plea....   I feel like I've been tricked and deceived by the proceedings on May 22, 2006....

(*Id*. at p. 7) (emphasis added).

27.   On June 4, 2006, Weldon, acting *pro se*, wrote a letter to AUSA Bracke wherein he requested a meeting to renegotiate the terms of his plea agreement.   (*See* Government Exhibit 1, admitted during 7/10/06 hearing).   More particularly, Weldon stated:

I would like an opportunity to sit down and speak with you prior to this hearing [on the motion to withdraw plea], *in hopes that we can reach a compromise or better agreement* that will prevent further court hearings or possibly the reinstatement of my right to be tried by jury.   Make no mistake about it, I have no desire to continue to be your adversary in this case, but now only desire to put an end to this legal battle and get back home to my family.

(*Id*. at p. 1) (emphasis added).   Due to perceived police misconduct by Detective Scheidt, Weldon requests that Bracke negotiate the terms of his plea agreement, stating that he:

hope[s] that we can reach a *more fair and reasonable plea agreement*, than the one that was presented on May 22, 2006?

(*Id*. at p. 2) (emphasis added)   Weldon also explored the possibility of vicarious cooperation on his behalf.   (*Id*.)   Weldon ended his letter with the following request to AUSA Bracke:

---

Court that Simmons took him to get some cocaine, which amounted to approximately one-quarter kilogram, that Simmons brought the cocaine to Kentucky for him, and that he was going to give her some money for transporting the cocaine for him.   Weldon also admitted that he intended to sell the cocaine once arriving in this area.   Based on those factual admissions, the Court accepted Weldon's plea of guilty to both counts.

> [W]e are pleading with you to remove this [Career Criminal] enhancement, and sentence me according to what the guidelines would be for the amount of Cocaine that I am being charged with... Lastly, I want you to know that me and my family are grateful that you gave me an opportunity to plea after all of this time, and we only hope that you find it within your heart to accept my proposal and request, *so we can reach a plea agreement* that justifies the means for both sides.

(*Id*. at p. 2-3) (emphasis added).

28.  During the July 10, 2006 hearing, Weldon continued to request a withdrawal of his guilty plea and acknowledged that all the facts surrounding the drug offenses and his agreement with Tamera Simmons were true.  He also admitted to writing the June 4, 2006 letter to AUSA Bracke in an effort to not be classified as a career criminal.

**III.    Analysis**

**A.    Applicable Law**

The withdrawal of a guilty plea prior to sentencing is a matter "within the broad discretion of the district court," *United States v. Spencer,* 836 F.2d 236, 238 (6th Cir. 1987) (internal citation and quotation marks omitted), and is governed by Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure.  In order to withdraw a guilty plea before sentencing, a defendant must "show a fair and just reason for requesting the withdrawal."  Fed.R.Crim. P. 11(d)(2)(B).  The purpose of Rule 11(d) "is to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty."  *United States v. Bazzi,* 94 F.3d 1025, 1027 (6th Cir.1996) (internal citation and quotation marks omitted).

In considering Weldon's request to withdraw his guilty plea, the Sixth Circuit had identified several factors which the district court must consider.  These factors include --

(1) the timeliness of the motion, (2) any reason for untimeliness, (3) assertion of innocence, (4) the circumstances surrounding the guilty plea, (5) the background of the defendant, (6) the defendant's exposure to the criminal justice system, and (7) prejudice to the government if the motion is granted. *United States v. Bashara,* 27 F.3d 1174, 1181 (6th Cir.1994). These factors "are a general, non-exclusive list and no one factor is controlling." *United States v. Bazzi,* 94 F.3d 1025, 1027 (6th Cir.1996). In reviewing these factors, courts do not look favorably on requests to withdraw guilty pleas that are motivated by tactical considerations. *United States v. Pluta,* 144 F.3d 968, 973 (6th Cir. 1998). The defendant has the burden of establishing the existence of a fair and just reason supporting the withdrawal of the guilty plea. *Id.*

### B.   Application of the *Bashara* factors

#### 1.   The timeliness of the motion/reason for untimeliness

Of the seven factors identified by the Sixth Circuit, consideration of these two factors favors granting the relief requested. Weldon waited only four days after his guilty plea to request to withdraw it. Unlike the many cases where the Sixth Circuit has rejected motions to withdraw based on untimeliness, Weldon promptly notified the Court of his intentions. However, for reasons set forth herein, the promptness in which Weldon acted does not offset the other factors that weigh heavily against granting the motion to withdraw.

#### 2.   The assertion of his innocence

In analyzing this factor, the Court notes that Weldon is not arguing that he is actually innocent of the counts to which he pled guilty. His statements that he has always maintained his innocence, in the Court's opinion, ring hollow. All defendants, by entering a plea of not guilty, protest their innocence until proven guilty beyond a reasonable doubt.

During the extensive plea colloquy with the Court, and later within the body of his May 26, 2006 letter, and during the July 10, 2006 hearing on the motion to withdraw, Weldon candidly admitted his guilt to both counts. *See* Findings of Fact at ¶¶ 18, 22, 23, 25, and footnote 7.

Although he contested the involvement of Miss Rogers, his factual admissions reflect a conspiracy between Tamera Simmons, unindicted co-conspirator named Chris, and himself. That conspiracy involved the purchase of approximately 250 grams of cocaine and the transportation of that cocaine by Simmons from Texas to Kentucky. Once it arrived in Kentucky, Weldon candidly admitted that although the cocaine was inside Simmons' hotel room, it belonged to him and it was his intention to sell it for profit. Weldon's admissions are also supported by several statements within his May 26, 2006 letter and his July 10, 2006 testimony wherein the following testimony was elicited on cross examination:

Q.   [AUSA Bracke] You did admit to Judge Bunning that the cocaine that was seized was cocaine that you had bought and that you intended to sell. You told Judge Bunning that, right?

A.   [Weldon]  Yes.

Q.   That was true, right?

A.   Yes.

Q.   Okay. You told Judge Bunning that you got this cocaine by going to Tamera Simmons, and that Tamera Simmons hooked you up with a Jamaican named Chris. That's where the cocaine came from. Do you remember that?

A.   Yes.

Q.   And that's true also, right?

A.      Yes.

Q.      You did continue to say Terrie Rogers wasn't involved, is that right?

A.      Yes.

Q.      But you didn't deny that Tamera Simmons was involved in hooking you up with this Jamaican named Chris.  You didn't deny that, did you?

A.      No.

Q.      And you admitted that Tamera Simmons brought your cocaine up to this area and that you were going to get it back and sell it.  You admitted that to Judge Bunning; isn't that right?

A.      I admitted that, but I – like I explained to the Court, that Tamera Simmons had no idea of what I was going to do with it, and I never told Tamera Simmons anything about what I was going to do with it.

Q.      I understand.  But you did admit that Tamera Simmons brought your cocaine up here and that it was your cocaine and that you were going to get it back from her, right?  You told Judge Bunning that?

A.      *Whatever I told Judge Bunning is the truth.*

Q.      Okay.  So the factual admissions you made to Judge Bunning during your guilty plea were all true?

A.      Yes.

Q.      You're not denying any of them as you sit here today?

A.      No.

(Doc. # 185, TR 7/10/06 hearing at 45-46) (emphasis added).

Although Weldon did not admit his guilt until the day the trial was to begin, up until

14

he decided to plead guilty he still was hoping that the Court would exclude any evidence of the positive fingerprint match.  Once the Court denied his second motion to exclude that evidence, he made the decision to plead guilty and has steadfastly admitted his guilt ever since.  Last minute decisions to plead guilty are commonplace, especially in situations where there are important evidentiary issues yet to be resolved, such as Weldon's second motion to exclude the fingerprint evidence.

For all of these reasons, consideration of this factor weighs heavily in favor of denying the motion to withdraw guilty plea.

### 3.     The circumstances surrounding the guilty plea

As set forth in ¶¶ 11-23 of the Findings of Fact, Weldon was given the entire morning on the day the trial was scheduled to begin to weigh his options and make his decision to plead guilty.  The record reflects Weldon considered a number of possible choices – trial, no contest plea, conditional plea, and straight guilty plea, and ultimately elected to enter a straight guilty plea with the hopes of receiving a substantial assistance reduction at sentencing.

As is reflected in the May 22, 2006, plea colloquy, the Court took great care in questioning Weldon regarding his decision to enter his guilty plea and made sure he understood the possible consequences of the plea, including his possible designation as a career offender under the guidelines, and how that might impact the advisory guideline range he could be facing.  He was also informed that the guidelines were now advisory and the Court could sentence him below the otherwise applicable advisory range based on the so-called *Booker* factors, also known as section 3553(a) factors.  The Court also made it abundantly clear that Weldon retained the option of going forward with trial rather than

15

pleading guilty.

The only limit was that the Court told Weldon it would not grant another continuance.[8]  Defendants are not permitted to delay criminal proceedings by entering a voluntary guilty plea only to then move to withdraw that plea.  Although Weldon indicates that he was hurried into pleading guilty, the record reflects otherwise.  The Court gave Weldon more than adequate time to consult with both his attorney and AUSA Bracke before entry of the plea.

Weldon was also given the weekend before the trial to contemplate the effect of the Court's decision to allow the government's fingerprint examiner to testify at trial.  Although Weldon had hoped the Court would reconsider its May 19, 2006 Order denying his motion to limine, he knew the Court had ruled that evidence would be admissible.  Simply put, Weldon's plea was knowingly and voluntarily entered and was not the product of duress. Nor was it hastily entered.

Moreover, as the Court has concluded that Detective Scheidt did not commit any misconduct while in the presence of Mr. Alderucci, Weldon's argument that Scheidt's alleged misconduct gives him a basis to withdraw his plea also fails.  This is not a situation involving surreptitious eavesdropping on attorney client communications by Scheidt.  As found by the Court[9], Alderucci shared his findings with Scheidt who employed no subterfuge in learning of Alderucci's findings.  Although the Court recognizes that the attorney work product doctrine protects materials prepared by retained experts, such as

---

[8]  The April 17, 2006 trial date had been continued at Weldon's request to ensure that witnesses he wished to testify were properly subpoenaed for trial.

[9] *See* footnote 2.

Mr. Alderucci's findings in this case, by sharing his findings with Scheidt, Defendant can no longer claim any privilege as to those findings. Even if the disclosure was inadvertent, the work product privilege is lost. *See United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 444 F.3d 462, 478 (6th Cir. 2006)(J. Griffin concurring).

More importantly, the government never sought to call Mr. Alderucci as a witness, rather, it made collateral use of Alderucci's findings, choosing to have the print resubmitted to another expert for identification and comparison purposes. Although it may be true that the government would have never resubmitted the print for further analysis if Alderucci had not reported a match, there was nothing inappropriate with the prosecutor's decision to resubmit the print to another expert. The prosecution's collateral use of the Alderucci's findings does not provide a basis for the withdrawal of Weldon's guilty plea.

Additionally, Weldon's argument that had he known that the career criminal enhancement was mandatory he would not have entered a guilty plea is belied by the record. The Court never advised Weldon that the career offender classification was mandatory because the guidelines are not mandatory. To the contrary, the Court advised Weldon several times that the guidelines were advisory only and even if the Court were to determine him to be a career offender, the Court could sentence him above or below those guidelines.

Weldon's motion is nothing more than an attempt by him to negotiate a better deal for himself. Throughout his May 26, 2006 letter and June 4, 2006 letter to AUSA Bracke, Weldon[10] seeks to have the terms of his plea agreement renegotiated so he can only be

---

[10] *See* ¶¶ 25-27 Findings of Fact

17

held responsible for the drugs found in the hotel room without any consideration of his criminal history.  Weldon's attempt to renegotiate the terms of his agreement to obtain a more favorable sentence is precisely the sort of behavior that the Sixth Circuit rejected as a basis for withdrawing a guilty plea in *Pluta*.

Weldon's situation is similar to that in *Pluta*.  Although Pluta waited longer than Weldon to seek to withdraw his plea, both defendants had extensive experience with the criminal justice system.  Both Pluta and Weldon also entered a competent, knowing, and intelligent guilty plea wherein each disputed some of the allegations of the United States but admitted the essential elements of the charge against him. 144 F.3d at 974.  Pluta, like Weldon, subsequently became upset at the application of a Career Criminal sentencing enhancement and filed a motion to withdraw his guilty plea, indicating, "I wanted to withdraw my plea, therefore, to renegotiate because I wanted to strike the statement of facts." *Id.* at 972.  As the Sixth Circuit stated in *Pluta*, "a motion to withdraw a guilty plea cannot be used as a means to achieve a better bargaining position for later plea negotiations." *Id.* at 974 (citation omitted).  That is precisely what Weldon is trying to accomplish by withdrawing his plea.

For all of these reasons, this factor strongly favors denial of Weldon's motion to withdraw guilty plea.

### 4.    The background of the defendant

This factor also favors denying Weldon's motion to withdraw.  Weldon is a high school graduate who has completed two years of college education.  He is not the prototypical defendant generally encountered in federal court. As has been detailed herein, Weldon was deliberate and thoughtful throughout his plea colloquy.  Additionally, the Court

18

had the opportunity to observe Weldon on many occasions during other pretrial proceedings and he is highly intelligent.  Weldon's intelligence can also be gleaned from the many written motions he filed *pro se*.  The plea transcript also reflects several instances where Weldon asked questions about the consequences of the plea, the Court responded, and Weldon indicated he understood.  For example, Weldon asked about *Booker* variances, and the Court explained that the Court could sentence him below the otherwise applicable advisory guidelines based on *Booker* factors.

### 5.   Defendant's prior exposure to the criminal justice system

This factor also favors denial of Weldon's motion.  Defendant is a veteran of the criminal justice system, including a prior federal conviction from the Southern District of West Virginia.  In that case, Weldon pled guilty and received the benefit of a substantial assistance motion at sentencing.  Due to his prior federal conviction Weldon is intimately familiar with the sentencing guidelines.  Weldon's prior exposure to the federal system and its guideline regime makes it highly unlikely that he did not understand the Court's explanations about the guidelines.

Additionally, the fact that Weldon was the prior beneficiary of a 5K1.1 motion in West Virginia indicates that he knows what is required to merit such a motion.  Weldon also has a state court homicide-related conviction to which he entered a plea of guilty.

The extent of his prior experience with the court system emphasizes the validity of Weldon's guilty plea and belies any claim that it was the product of confusion or duress.

### 6.   Prejudice to the government if the motion is granted

The final *Bashara* factor also favors denial of the motion.  As pointed out by the government, allowing Weldon to withdraw his guilty plea would prejudice the United States

19

because cooperating co-defendant Tamera Simmons has already been sentenced and released from custody.  Although she could still be compelled to testify at trial if the Court permitted withdrawal of Weldon's plea, the government has already made and the Court has already granted a 5K1.1 motion on her behalf based on Weldon and co-defendant Rogers' guilty pleas.  Thus, because Simmons has already received the full benefit of her bargain, the compulsion of her testimony would likely be with less force as was previously applicable.

The same situation was evident in the *United States v. Bazzi* case.  In *Bazzi*, the Sixth Circuit affirmed a district court's decision to reject an attempt to withdraw a guilty plea under the same standard applicable here.  A key factor cited by the court in support of the denial of the attempt to withdraw the guilty plea was the fact that due to his guilty plea, the government "lost any leverage it might have needed relative to other defendants testifying against Bazzi.  Since all of the other defendants had entered guilty pleas, the government also had ceased its trial preparation for what would have been a lengthy and involved trial." 94 F.3d at 1027.  The same can be said in Weldon's case.

Although Weldon testified that he was unaware that Simmons had been sentenced when he filed his motion to withdraw plea, the government's case has been prejudiced due to Simmons' sentencing.  By waiting until after Ms. Simmons has been sentenced to move to withdraw his plea, Weldon has gained a tactical and practical advantage because her testimony would not have the same force as it would if she had not yet been sentenced.

### IV.  <u>Conclusion</u>

Although the first 2 *Bashara* factors favor granting Weldon's motion to withdraw his guilty plea, the remaining 5 factors weigh against granting the relief.  Although the plea was

entered the same day the trial was to begin, the record reveals that it was neither hastily entered nor made with unsure heart or confusion.  Because Weldon has failed to establish the existence of a fair and just reason to withdraw his plea under the applicable standard, and for the reasons stated herein,

      **IT IS ORDERED** that Defendant Weldon's Motion to Withdraw Guilty Plea (Doc. #174) be, and it is, hereby **denied**.

      **IT IS FURTHER ORDERED** that the **Sentencing** in this matter is hereby **rescheduled** from September 1, 2006 to **October 13, 2006 at 11:30 a.m.**

This 20th day of July, 2006.

Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\ORDERS\CovCrim\2005\05-45-Order-Weldon-Denying-Motion-To-Withdraw-Guilty-Plea.wpd